68402, 68601. BROWN et al. v. COMMERCIAL CREDIT EQUIPMENT CORPORATION; and vice versa.

(323 SE2d 822)

QUILLIAN, Presiding Judge.

Defendant, Stephen A. Brown, appeals from the grant of a Motion for Directed Verdict in favor of plaintiff, Commercial Credit Equipment Corporation. Commercial Credit appeals the denial of its Motion to Dismiss Brown's appeal. Brown was a Certified Public Accountant, doing business as Stephen A. Brown and Associates, Inc. He owned two aircraft — an Aero Star and a 1977 Cessna-182 Skyland. Both planes were financed by General Electric Credit Corporation. Brown contacted Grane Aviation, Inc. at DeKalb-Peachtree Airport to sell the Aero Star. Grane received an offer to purchase with a $5,000 earnest money deposit. Brown kept his planes at the Charlie Brown airport and saw a Bellanca Viking which he attempted to buy. Grane advised him not to buy until he had spoken to him. Thereafter Brown Associates purchased a Bellanca Viking from Grane for $80,000. Brown testified that he traded in his Cessna-182 on the purchase of the Bellanca and delivered it to Grane at the DeKalb-Peachtree Airport and made out and delivered a bill of sale to Grane. He took the Bellanca and flew it to the Charlie Brown Airport. An "Aircraft Purchase Order" was introduced in evidence which showed the total purchase price of the Bellanca to be $102,784 less a trade-in of a value of $57,784, leaving $45,000 due to Grane Aviation. Brown testified that he paid $1,000 to Grane leaving due $44,000. The

purchase order contained the same figures. Brown also testified that the pay-off to General Electric on the Cessna-182 was $31,900 and a few dollars.

Rick Wyatt, Vice President of Grane Aviation, stated that Grane sold Brown the Bellanca for $80,000. They originally agreed to take the Cessna-182 in trade but after it had been delivered and they finally procured the log books a few days thereafter, they discovered the plane had been in an accident before Brown purchased it. It was Grane's policy not to buy or sell previously damaged aircraft because of the exposure to liability. Wyatt said a second purchase order was prepared which called for $80,000 cash and did not call for a trade-in.

Brown applied for and was accepted by Commercial Credit for a loan of $80,000. Jerry Truell, Credit Manager for Commercial Credit took the application for credit from Brown. He denied seeing the Aircraft Purchase Agreement given to Brown by Grane Aviation. He also testified that Commercial Credit did not loan money to Brown to pay off the Cessna and they were not requested to do so by Brown. They loaned Brown $80,000 to purchase the Bellanca and to his knowledge there was no trade-in. After Truell finished the credit statement he gave it to George Hitt, the Aircraft Marketing representative for Commercial Credit who prepared an Aircraft Security Agreement, using the Bellanca to secure the loan, and took a personal guaranty from Brown. Hitt also stated that Brown did not talk to him about a trade-in on the purchase of the Bellanca. He was not aware of the Cessna being involved in this purchase, and Commercial Credit was not obligated to pay off the amount remaining due on the Cessna to General Electric Credit. He denied that Brown told him that a portion of the funds borrowed were to be used to pay off the Cessna. The loan was approved and the total amount borrowed — $80,017, was sent to the bank that had provided the financing for the purchase of the plane by Grane Aviation.

According to Truell and Hitt, there is no "formal closing" in aircraft purchases, and no closing statement is ever made out. There is no form showing how disbursement is to be made. Hitt stated that if a separate disbursement is to be made to another bank other than the one financing the purchase for the aircraft seller, then it would have been placed in a notation on the side of the agreement. There was none on Brown's agreement. There was no document introduced which showed how the borrowed money was to be disbursed.

Under the security agreement Brown was to procure insurance to cover the Bellanca and provide a copy of the contract to Commercial Credit. No binder or policy was ever given to Commercial Credit. Commercial Credit was notified that the insurance had been cancelled. Brown testified that there was insurance coverage on the Bellanca. The first payment on the Bellanca was due on May 11 and it

was not made on that date. Brown said that the controller for his corporation had not received any documentation from Commercial Credit. Brown made the first payment for his corporation by his personal check. Shortly thereafter General Electric notified him the monthly payment due on the Cessna had not been paid and he discovered that none of the borrowed funds had been disbursed to General Electric. He called Hitt "and I wanted to know why the airplane wasn't paid off . . . He said, 'Well, maybe I better talk to Tom Grane about it.' . . . I said, 'George, why didn't you disburse the money according to my instructions?' . . . All he had to say was, 'Maybe you better talk to Tom Grane.' " Grane Aviation sold both the Aero Star and the Cessna but Wyatt said that they did so on instructions from General Electric. Grane was the highest bidder on the Bellanca and purchased it for $62,000. Brown has an action pending against Grane Aviation but it is not involved in the instant case.

Commercial Credit brought this action for a writ of possession for the Bellanca, and after it was repossessed and sold, the complaint was amended to seek a deficiency judgment. The trial court granted Commercial Credit's motion for directed verdict and Brown brings this appeal.

Brown did not file the transcript within the prescribed time, nor did he request an extension to file until time had expired. Commercial Credit appeals the denial of the trial court's refusal to dismiss the appeal. *Held*:

## *Appeal 68601.*

1. Commercial Credit contends the trial court erred in failing to dismiss the appeal of Brown for failure to timely file the transcript. Judgment was entered for Commercial Credit on September 22, 1983, and defendant's Motion for New Trial was denied on October 21, 1983. Notice of Appeal was timely filed on Monday, November 21 — the 30th day being on Sunday. The Notice of Appeal stated that a transcript of the evidence was to be included in the record, and should have been filed with the clerk on or before 30 days following the filing of the Notice of Appeal. OCGA § 5-6-42. The transcript was not filed until February 15, 1984. Commercial Credit filed a Motion to Dismiss the Appeal on January 30, 1984 and a hearing was held on February 3, 1984.

It was determined that Brown had paid the reporter for his one-half of the take-down services cost and asked for the transcript. The reporter called Brown on January 3, 1984 and said the transcript was not ready and he would need an order and she wanted her fee in advance. He forwarded her a check on January 3rd with the fee and asked the judge's clerk for an order. He did not have a final date and

had to call the reporter. After he reached the reporter he returned to the court with an order setting February 15 as the due date. This was January 11th, and the judge signed the order. The trial court determined that the delay was both reasonable and excusable.

Our Supreme Court has held that "[t]he failure to timely file a transcript is not a basis for dismissal of the appeal unless the trial court finds that the delay was unreasonable, and that the unreasonable delay was inexcusable. [Cits.] The trial court's decision on this issue will be reversed only for an abuse of discretion. [Cits.]." *DuBois v. DuBois*, 240 Ga. 314 (1) (240 SE2d 706). Our review of the evidence shows that the transcript was timely requested and the reporter was paid in advance but the delay was due to press of work of the reporter. We have found no abuse of discretion. See *Patterson v. Professional Resources*, 242 Ga. 459 (1) (249 SE2d 248); *Compher v. Ga. Waste Systems*, 155 Ga. App. 819 (1) (273 SE2d 200).

*Appeal 68402.*

2. Brown contends that the court erred in directing a verdict for Commercial Credit in the entire amount sought, and in not allowing their defense of partial failure of consideration to be considered by the jury. We agree and reverse.

Brown testified that he first talked to Truell at Commercial Credit and gave him the information on Commercial Credit's "Credit Statement." On his second visit he talked to Hitt and described the transaction "in detail." "It was structured for the trade-in of the Cessna, that was the only way it was ever structured." Brown also stated that he called both Grane and Hitt before closing and advised each he could not be there for closing but for them to look out for his interest. He had called General Electric and was told the amount due on the Cessna-182 — $31,900 and a few dollars, "[a]nd communicated that directly to George Hitt, and said that I had talked to General Electric Credit, gave him the name of the individual in case he needed to talk back and forth. And I wanted to make sure that the Cessna was paid off and the money went to General Electric Credit Corporation . . . He said there would be no problem with it, that my interest would be protected at the closing . . . and General Electric Credit would receive the payment." Truell and Hitt both deny that they discussed a trade-in with Brown, and stated that they were under no obligation to make a pay-off to General Electric on the Cessna-182.

The Commercial Credit Statement taken by Truell and given to Hitt to prepare the security agreement shows the price of the Bellanca to be "List $102,784." This same figure appears on the Aircraft Purchase Order that Truell says he did not see. In Commercial

Credit's "credit statement," in the general information section, it contains the following: "145,000 77 Aero Star — selling," and on the line below that entry is "77 Skyland (Being traded on Bellanca . . ." On the reverse side of Commercial Credit's credit statement are the following figures: "45,000" — the amount which the Aircraft purchase order and Brown's testimony show was due to Grane rather than the $80,000 paid to Grane by Commercial Credit. Underneath the "45,000" figure is "1977-182." According to Brown his 1977 Cessna-182 was to be traded in on the purchase price of the Bellanca. Both Truell and Hitt deny that a trade-in was involved in their loan. In another area on the reverse side of Commercial Credit's credit statement are the figures "45,000" and "57,784." The Aircraft Purchase Order shows $45,000 was to be paid to Grane and Brown was to receive credit for $57,784 as the trade-in of the Cessna-182. In addition, the Aircraft Security Agreement executed by Brown to Commercial Credit recites: "Commercial Credit has lent Customer and Customer hereby acknowledges receipt of *eighty thousand seventeen dollars and 00/100* Dollars ($80,017.00), including disbursements made on Customer's behalf, herein called the 'Indebtedness' . . ." The reference to additional disbursements is included in the printed format.

Our Code authorizes a directed verdict only "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict . . ." OCGA § 9-11-50 (a). The very essence of a motion for a directed verdict is that there is no genuine issue of any material fact to be resolved by the triers of fact. *McCarty v. Nat. Life &c. Ins. Co.*, 107 Ga. App. 178 (1) (129 SE2d 408). Further, in considering a motion for directed verdict the evidence must be construed most favorably to the party opposing the motion — in this instance the defendant Brown. *Nationwide &c. Ins. Co. v. Ware*, 140 Ga. App. 660, 664 (231 SE2d 556). It is for the jury, not the trial judge, to resolve any material inconsistencies. *Johnson v. Mann*, 132 Ga. App. 169 (207 SE2d 663). In the instant case the principal issue was whether or not Commercial Credit disbursed the borrowed funds in accordance with the instructions of the borrower. Brown testified that they did not. Agents for Commercial Credit said that Brown did not instruct them how to disburse the funds and they were unaware that a trade-in was involved in the purchase of the Bellanca. In this connection, it should be noted that Grane Aviation apparently agreed to a definite dollar amount as to the value of the Cessna to be traded in, but changed their mind after it was delivered and they discovered it had been in an accident before Brown purchased it. This change was made several days after the plane had been delivered and Brown said he had signed and delivered the bill of sale. Although Hitt said that a second purchase order was made out, it was not introduced in evi-

dence. It should also be noted that Grane later sold the Cessna but denied ever receiving a bill of sale. We find many material conflicts in the evidence.

3. Although the main issue contested in this action was the partial failure of consideration, it was not pled as a defense as required by OCGA § 9-11-12 (b). The fact there was a claim of partial failure of consideration was placed in issue by counsel for the plaintiff on cross-examination of Brown. Thereafter, counsel for defendant pursued the issue in detail — without objection. After the close of the evidence the court announced: "Whether or not you properly or improperly disbursed the money is the only issue I'm going to let the jury have." However, the court then directed a verdict for the plaintiff.

Where evidence establishing a defense not pled in the answer is admitted at trial without objection, the pleadings must be treated as if amended to include that issue since it was tried by express or implied consent of the parties. OCGA § 9-11-15 (b); *Mansell v. Benson Chevrolet Co.*, 165 Ga. App. 568 (2) (302 SE2d 114). " 'The fact that a defense, even an affirmative defense, has not been formally pleaded is immaterial if the issue was tried by express or implied consent . . . Rule 15 (b) is not permissive in terms: it provides that issues tried by express or implied consent *shall* be treated as if raised by the pleadings.' " *McDonough &c. Co. v. McLendon &c. Co.*, 242 Ga. 510, 514 (250 SE2d 424). The defense of partial failure of consideration was raised by the unobjected evidence offered during trial. It was error to exclude this defense from consideration of the jury.

4. The remaining enumeration is rendered moot by our holding in Division 2, supra.

*Judgment in 68402 reversed. Judgment in 68601 affirmed. Birdsong, J., concurs. Carley, J., concurs in the judgment only.*

DECIDED SEPTEMBER 14, 1984 —
REHEARING DENIED NOVEMBER 13, 1984.

*Tom Pye*, for appellants.
*Eugene Novy, Penelope W. Rumsey*, for appellee.